Let's begin with our first argument of the morning. It's in Appeal No. 25-1750, Russia Brown v. Chicago Transit Authority and others. Ms. Abraham, nice to see you. Whenever you're ready. Thank you. Good morning. May it please the Court, my name is Christina Abraham and I represent the Plaintiff Appellant, Russia Brown. There is ample evidence in the record to permit a reasonable jury to find in Mr. Brown's favor. I will start with the discrimination and retaliation claims. First, regarding the CTA, there is substantial evidence from which a jury could infer discriminatory and retaliatory motives surrounding Brown's discipline and his termination. Brown engaged in multiple forms of protected activity, including complaints regarding workplace treatment, complaints involving harassment, and advocacy concerning gender-affirming health care coverage, which was done through the ACLU. All of this was based on his transgender identity. The record also reflects ongoing workplace issues related to his transgender status. He experienced conflicts regarding restroom access after transitioning. Brown was told by management that they could not always protect him from co-workers' reactions and they did not want others to get fired because they harassed him. Brown reported threats and harassment by co-workers on social media, but CTA passed the issue off to the union and the union did nothing. A jury could consider those earlier events together with the evidence surrounding Brown's termination. CTA decision-makers were aware of Brown's complaints and advocacy, which were widely known. Can I pause you on that? Yes. Do you want to finish your thought there? I was going to say including through the media attention that was garnered when he advocated for gender-affirming care. Okay. He, Mr. Brown was terminated for at least the stated reason that CTA gave was for FMLA falsification or submitting, taking FMLA leave without request, correct? Correct. Okay. What is your, what is your best evidence that that was pretextual? And the reason, I'll tell you why I'm asking that question. The ultimate decision-maker, you can correct me if I'm wrong, was Arlana Johnson? I would dispute that she was an ultimate decision-maker. I would concede that she was one of the decision-makers. In addition to who? Mr. DeJesus? DeJesus, Alicia Latham Hill, who later took DeJesus' place as well. And I think there are other members of, of CTA management that may have had a say in that decision. Okay. Is there, is there evidence that Ms. Johnson was aware of the three instances that you began your argument with? Well, there is circumstantial evidence, yes. There isn't direct evidence. But at summary judgment, direct evidence isn't required. What's the, what's the circumstantial evidence? The fact that when Brown transitioned and requested bathroom accommodations, a general email to CTA leadership across the board was sent out about his accommodations. The fact that when he requested gender-affirming care, it was on the media. And we have several witnesses on record saying everybody knew about it, everybody was talking about it at the time. And so, she has self-serving testimony, yes, that says that she didn't know anything about any of those things. Was she on that email chain? I, I'm not sure. I can check. How can, well, how can you, you said there was an email that went out to leadership. You obviously know of the lead, of the email, but if you don't have evidence showing that it went to her, there may be other issues with you, with this, but if you don't have evidence showing it went to her, that's a pretty big inferential leap you're asking us to take. That, I don't, I wouldn't say it's an inferential leap to say that if everybody was talking about it because it was on the media, that she probably knew as well. It was common knowledge. And also, Hill talked about it very openly with you, with CTA leadership. And so, CTA acknowledged, hold on, Hill, who's Hill? I'm sorry, Keith Hill is a union president. Oh, yeah, yeah, yeah, yeah. And so, when Keith Hill was transferred, I'm sorry, when Brown was transferred to the 77th Street Garage, he gave Keith Hill a warning. That warning was, all your bitching is not going to work down here on the South Side. He has relationships with management, Hill does. And so, I don't think that it's a leap to say that he discussed these things, as he did with the management in the previous garage, telling them things like, him requesting an accommodation for the restroom is akin to being a disabled person and he should be taken out of service. He continued that behavior when Brown transferred to the South Side Garage. I don't think, I think circumstantial evidence permits that inference. I want to go back to Judge Scutter's prior question about pretext. The record shows that your client was fired per CTA for falsifying his FMLA records, that he called out for FMLA leave for over 20 occasions without complying with the process, and that he hadn't gotten clearance for that leave because he didn't submit medical records and didn't get a third opinion. What is your strongest evidence that that reason of falsifying FLMA records was pretext? Thank you. CTA acknowledged that before the transition to the new third-party administrator, Brown had previously correctly reported his FMLA absences. Managers were required to reconcile those absences with the TPA on a The record also contains evidence that the transition created widespread confusion among employees regarding the new reporting procedures and that the union raised those issues with the CTA on behalf of members. The district court found that you did not submit evidentiary support for this claimed policy that they were supposed to reconcile it. That was, that came through manager Gregory Middleton. What's the support in the record though that the district court found you didn't support it? I didn't see any support in the record for it. I would point to our additional facts in the docket 129, so our CTA response to the SMF plaintiffs additional facts paragraph 18, and we cite to Gregory Middleton, he's a former manager at CTA, and he said this was a practice that they weekly, on a weekly basis, reconciled FMLA absences with the TPA to make sure that the issues don't come up. The record also contains evidence that the unresolved third medical opinion process supported competing inferences. Brown was never permitted to undergo the third medical evaluation. He, his discipline kept being extended so that he can undergo the third medical. He kept calling the third party administrator to schedule it, and at the end it was CTA that decided not to allow him to undergo the third medical opinion, and instead deny his FMLA claim, and then retroactively hold all of the time that he had taken off on the pending FMLA claim as falsification itself. He never, the record shows that he never responded to CTA with the third medical. He did respond. He called, there's, there are emails in the record that show that he was calling the TPAs discussing that with CTA management, and they say just deny his FMLA. The district court found that there was no evidentiary support in the record. Well, I'm glad that this court's review is de novo, and that you will see that the district court, I believe, got that wrong, and on pages three to six of my reply brief, I go into the specifics of the things that, you know, for example, the court said I didn't support in my response, and my response admitted the fact that was being asserted, or it did cite to facts, or it did cite to evidence in the record, and so I hope you take a close look at that, and that you, you know. I think the challenge was the evidence you cited didn't say what it, you represented, it did. But I claim, I, the court never explains why it came to that conclusion. The deposition testimony of Middleton is very clear. He says that they weakly reconciled these absences. I don't see how anyone can go around that, that there's a competing inference there, if the summary judgment standard is fine. None of the employees identified by CTA as discharged for FMLA falsification were discharged for taking leave while a request remained pending, and the request had already been denied at the time they took their leave. Brown is the only employee identified in the record who was discharged for falsification based on leave taken while a request remained pending. And we also have two examples of 77th Street garage employees being brought back either after discharge or on a last-chance agreement. Those are operators Harvey and Winston. And on the issue of the decision-maker, Alicia Latham Hill gave a last-chance agreement to operator Winston, which undermines the CTA's argument that Johnson was the only decision maker. On retaliatory inference, after Brown transferred to the garage, DeJesus and Hill made that comment in June 2020 about that bitching comment. DeJesus did an audit of Brown's absences, which covered June 2020 through October 2020, beginning during that same period that Hill made that statement. Hill's statement to Brown permits the inference that Hill believed he could influence how Brown would be treated at the Southside garage. And that evidence undermines the argument that the protected activity is temporally remote and can't support an exodus. And with regard to the union's complicity in this and their actions, this is the November 2020 comment that Hill made on Facebook Live, and I'm cleaning up the quote. He says, I can't say this the way I want to say it on Live, because I don't want it coming back to me. You can get a whole sex change on our health insurance. And that comment is coming in response to a question about why don't we change our provider? It had nothing to do with gender-affirming care. That comment tells you that Brown's protected activity and transgender identity were still actively on Hill's mind in November of 2020, while he was facing discipline by the CTA. And his comments to Catherine Lund from Labor Relations are pretty telling. He undermines Brown, and he's the only member that apparently is undermined by Brown. And he tells Lund that Brown was bragging about abusing FMLA, which is not true. There are strong factual disputes that support an inference that a jury could find in my client's favor. Ms. Abraham, what's the status of the underlying arbitration? It's pending, and it has been pending for five years. But I would argue that he should never have been put in the position to begin with. Had he not been treated the way he was by the union and by CTA, he wouldn't be waiting for an arbitration, because he never would have been discharged. Is it on hold pending the outcome? I don't know. You have to ask the defendants that. My understanding is he's in a queue. Is that arbitration on the union grievance? Yes. Okay. Related to the FMLA interference and retaliation claims, CTA didn't merely treat this as a reporting or attendance issue, which is a procedural violation under the corrective action guidelines subject to graduated discipline. It escalated Brown directly to a behavioral falsification, which requires intent and results in immediate discharge. But Brown presented evidence that the falsification requires intent under the guidelines. That's in the guidelines themselves and Middleton's testimony. And that CTA knew the transition to the third party administrator had created widespread confusion regarding reporting requirements. And that tells us that they may not have honestly believed their asserted reasons. A reasonable jury could therefore conclude CTA transformed disputed reporting issues into a dishonesty offense so that it could immediately discharge Brown. And if employees can be fired for falsification while FMLA requests remain pending, a jury could reasonably conclude that that policy itself would deter employees from exercising FMLA rights. Your Honor, I see that I am in my time for rebuttals. If there are any other questions, I'd like to reserve my remaining time. Very well. Thank you. Okay. We have arguments now from the two appellees. You're going to split the time, correct? And Ms. Masters, nice to see you. You're going to begin. May it please the Court, Ruth Masters, on behalf of the CTA. This Court should affirm summary judgment in the CTA's favor. CTA has provided the Court in its brief pages of details about Mr. Brown's misrepresentations of the District Court's record and misstatements of the relevant law, and lack of statement at all in the opening brief of legal principles at issue, and why, given all of these defaults, Mr. Brown is not left with any arguments of material disputed fact up on appeal to seek reaffirmance. And I would refer the Court to the cases of Hinterberg Burger v. City of Indianapolis and Friends v. Valley View Community. Today, I have heard multiple reiterated misstatements of fact. Before proceeding to the merits, counsel mentioned the reply brief. First of all, one cannot bring up new arguments in a reply brief, but counsel specifically referred to pages 3 to 6 of her reply brief, which bring up new allegations of fact. Counsel refers to an incorrect page of the District Court opinion, saying things can be found on page 3 of the District Court opinion. In fact, they are not. The District Court's explanations for why it excluded paragraphs 28 and 29, which are brought up in the reply brief, are found on page 32 of the District Court's opinion, and in fact specifically refer to incomprehensible sites. And with respect to paragraph 29, which was an admission that the admission counsel cited was irrelevant to the issue that it was being cited for. So we stand by our arguments on waiver, on failing to meet the Court's briefing standard, and believe it should be appeal on that basis alone. Before you go into the merits, can I just echo Judge Saney's question about what's going on with the grievance? Your Honor, I actually don't know. Or maybe that's better for... Okay, we'll save that. I'm ahead of myself. Thank you. It's undisputed that Mr. Brown failed to report 24 FMLA absences to the third-party plan administrator, and that's why he was fired, the same as four other employees from the same garage. Now, I just heard counsel refer to Operator Winston and someone named Hardy. As the District Court found, the plaintiff did not present evidence from which a comparator analysis could be made. I think Winston was the only one even mentioned in a footnote. I don't think Hardy was even mentioned as a comparator. I believe that's correct, Your Honor. And certainly as to waiver, those people aren't even mentioned in the argument about similarly situated people in the opening brief, which is, of course, a waiver. So there is no evidence on that. There is no evidence of pretext. The Mr. Brown was treated the same as every other employee who failed to report his absences, and there's no evidence that Mr. Brown's status of being transgendered was a motivating factor in his discharge. Everything counsel's talking about happened three years before. There's no link to Arlana Johnson, who is the sole decision-maker. Again, the District Court found that there was no evidence she was not the sole decision-maker. Again, counsel has referred to Hill, who is a union employee, making statements that perhaps could be interpreted as discriminatory, but those are statements by a union employee. There's no evidence and no law cited for the proposition that statements made by somebody else could somehow form a basis of the cat's paw argument. There was no authority cited for cat's paw. There was no discussion in the brief about DeJesus and Latham Hill, who made the recommendation about being fired, bearing him animus. All there is is, perhaps at most, that people knew his status. There's no case that holds knowledge of someone's gender status as standing alone a basis of alleging discrimination. For Title VII retaliation, counsel did not rely upon the but-for standard in the opening brief. In fact, specifically cited the wrong standard of motivating factor. That argument is waived, but besides that, there is no evidence that Mr. Brown's FMLA status was a reason he, I mean, his gender was a reason for Title VII retaliation. And I'd refer the court to the Pataracas case versus City of Chicago, which states that when a plaintiff, when there is no dispute of the underlying fact, and there isn't a dispute about him failing to comply with the reporting requirement, there's also no dispute that the CTA is entitled to treat that not as a mere procedural default. It treated everybody the same for that, that it is actually a dishonesty. It's an issue of dishonesty. I'd point the court to the fact that Mr. Brown, when he applied for leave to Reed Group, they specifically sent him a letter we cite. I think it's found at 113 Exhibit 33 that states, call this number every time you're going to be absent, that there was an advertising campaign about that. His, his, and he had done it before, and he had done it before. Was that information about what employees were required to do if they wanted to take FMLA leave or needed to when the third-party administrator changed to Reed Group? Was that known to the employees? Is that what you're talking about? There was correspondence that was sent out saying, hey, we've now got a new third-party administrator. If you need to take leave, here's what you need to do. There was an advertising campaign about that, and the letter from Reed Group when he applied specifically said, call when you're taking absences. Here's your claim ID, and he did not. If I can turn to FMLA interference and retaliation, I point out that there's no, that the law is that if a, if a employer has a reasonable, an honest suspicion that someone is abusing FMLA leave, that they are entitled to discipline that person, and that that is not an FMLA violation. Council is talking a lot about this third opinion process, but the reality is there's no dispute about him failing to report his leave properly, and the third opinion process, there were a bit of a glitch in there where there was some miscommunication between, or slow communication, I should say, between the the entity that, that found that he had not completed the third opinion process in a timely manner, which was on October 7th, to Reed Group, and Reed Group's reporting of that to the CTA, but none of that shows FMLA interference or retaliation. Basically, at the end of the day, what Mr. Brown is advocating is that because the CTA didn't enforce its rule against him, which is ultimately what happens when the issue of whether he can get a third opinion reaches the, the CTA's head of human resources who is in charge of leave administration, she says no, this is how we enforce our rule, and he's not going to get a special exception. That's not FMLA interference or discrimination, or retaliation. I'm going to stand on the brief for the Monell claim, if the court has no further questions. Mr. Masters, thank you. Mr. Luscombe, nice to see you. Good morning, your honors. May it please the court. My name is George Luscombe. I represent the Appellant Amalgamated Transit Union, Local 241. Your honors, I will ask the court to affirm the district court in all respects with respect to the union. I'll start with answering the court's questions about the status of the arbitration. I'll start with, you know, what's in the record. The record showed that the union filed a grievance challenging the termination. That grievance was advanced to arbitration, which put it in the queue of arbitration cases, which is the record reflects, as of January 2023, had 884 discharge arbitrations waiting for hearing, that no arbitration cases, discharge arbitration cases, filed after Mr. Browns went to hearing, and that seven other discharge cases of FMLA falsification that were filed before Browns were also waiting for arbitration, just like Mr. Browns. Going beyond the record, because the record was closed, that arbitration is still pending because of the backlog of cases. It still is the case. Is there any relevance to this appeal? Any jurisdictional significance or any other form of significance? No, your honor, I don't believe so because of a Title VII discrimination claim can exist outside the grievance and arbitration process of the collective bargaining agreement. Mr. Luscombe, let's turn for a moment to the actual decision to terminate and the decision not to give him a second chance letter or last chance letter. Unfortunately, you have to deal with the utterances of this Mr. Hill, who was rather a loose cannon during that procedure. Why didn't Mr. Hill's statements really amount to a lack of representation? Why don't they amount to at least disparate treatment in his representation of this person as opposed to others? He certainly let his feelings be known as the company was making the termination letter decision and the last chance decision. Well, your honor, first, I think the record reflects that the comments that are alleged that Mr. Hill made were not actually related temporarily or subject matter to the representation of Brown beginning in October 2020 when he was taken out of service for a pending investigation of the discharge allegations and when he was discharged in January 2021. The comments that were alleged that Hill made regarding the restroom access were back in 2018, multiple years before. The comment about the south side garage was made around four months earlier in June of 2020. The one comment that was that was temporally related, the Facebook live video, frankly, and just an argument, counsel limits that comment that doesn't show what it actually said. That Facebook live in total said this, quote, brother little, I can't say what I want to say. People complain about our health insurance and I don't say this the way I want to say it on live because I don't want it coming back to, you can get a whole sex change on our life insurance, on our health insurance. And the problem is most members don't know how to use it. You get a PPO, should no hospital or doctor be charging you a co-pay. You pay 10% of your bill up until you reach your deductible and then it's free. We just don't know how to use it. We got people enhancing their body parts off this insurance. If you can use it to get better body parts, you damn sure you can use it to save your life. He's clearly- How about his comments to Ms. Lund at the time they were making the decisions about his termination and about the letter. Those are fairly contemporaneous. He talked about this guy bragging about the fact he didn't have to work, et cetera, et cetera. Ms. Lund didn't particularly think these were cast the plaintiff here in particularly good light, did she? The comments that are attributed to Lund, correct. One, he did not reference braggartly about FMLA abuse. That's not what he said. It's not what alleged what he said. Lund was not the decision maker. The record is entirely devoid of any evidence that Lund communicated that comment to the decision maker, Arlana Johnson. The record is devoid of any evidence that Hill's statement to Lund in any way influenced her to in some way influence Arlana Johnson. Doesn't the evidence show though that Lund did participate in that decision? I don't think it shows that she participated in the decision. I think the evidence shows that CTA Labor Relations does a legal review of the decision made and assist in writing up the paperwork, but the decision is made by the senior manager, Arlana Johnson. So, I think there's no evidence that Hill's statement had any influence on that decision. I'm particularly worried about the last chance letter. In the last chance letter, attitude counts. Ms. Lund made that clear, and it's clear that your member evinced something other than a positive attitude in his conduct in the union hall. Your Honor, what the record reflects is that the last chance agreements by the union are requested of the manager, Jairo Naranjo, and that's who Hill requested it of. The record reflects that it's not Lund who he requested of. That decision is made by Jairo Naranjo. When Jairo Naranjo refused, Hill went above his head to the chief transit officer, Donald Bonds, who also refused. And there's nothing in the record that shows Hill did anything differently for any other member. And with that, Your Honor, I see my time is up. And so, if there's no other questions from the court, thank you, Your Honors. Okay. Hearing none, Mr. Luscombe, thank you. Ms. Abraham, you have that rebuttal time remaining. Thank you. A few points. CTA stated that I misquoted the page number of the judge's order. I wasn't citing to the judge's order. I was citing to my appellate reply brief, pages three to six, where I address where the judge, where the courts identified specific paragraphs. And with respect to their stated reasons for terminating Mr. Brown, it was not an honest suspicion. Because why did they keep extending his discipline in order to supposedly give him the opportunity to take the third medical exam and then not permit him to take the third medical exam and then ultimately come to the conclusion that he should not undergo it and deny his appellate claim anyway? The union also only addresses the delayed arbitration. They don't address the conduct prior to which led to Brown's discharge, which the court also noted his undermining of Mr. Brown is unique. And there is no evidence that he did that with any other member. Regarding the last chance agreements, if you look to dockets 138 and 136, these are CTA and ATU's responses to the plaintiff's statement of additional facts. Paragraph 37 of docket 138 and paragraphs 28 of docket 126 shows you that operator Harvey and operator Winston from the 77th Street Garage received last chance agreements. Their responses essentially admit to it if you take the ATU's and the CTA's and look at them together. And there are a lot of other employees noted in paragraph 28 of docket 126 that identifies other people who were also spared from discharge. The call-out procedure changed when the third party administrator changed. This is what caused the widespread confusion and the ATU itself acknowledged this and raised those issues with CTA, which is perhaps what prompted CTA to later create this PR campaign so that the employees would better know. But that doesn't- Specifically, how did the call-out procedure change? The call-out procedure, my understanding is that with the previous administrator, they only had to make one phone call. And with this, they had to make two. And that is essentially what caused that confusion. Brown was uniquely discharged for falsification while his FMLA request remained unresolved and pending. And I would argue that that as a policy is interference and retaliation. If an employee is facing potential falsification and discharge, if they take leave on a pending request that later gets denied, that would deter any reasonable employee from perhaps even requesting FMLA at all. I see my time is up. Thank you very much for your time today. You're quite welcome. Ms. Abraham, thanks to you. Ms. Masters and Mr. Luscombe, thanks to you. We will take the appeal under advisement.